## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**BRYANT NEIL BROWN,**

     **Plaintiff,**                    **Case No.: 4:19-cv-345-MW/MAF**

**v.**

**HON. WALTER McNEIL, as Sheriff of Leon County, Florida, and CORIZON, LLC, a Health Services Corporation, and MARIA LILIANA GARCIA, M.D., CELESTE MACDONALD, and DEBBIE SELLERS, individually,**

     **Defendants.**

_____ /

## DEFENDANT SHERIFF WALTER MCNEIL'S
## MOTION FOR FINAL SUMMARY JUDGMENT

Defendant, WALTER MCNEIL, in his official capacity as Sheriff of Leon County, Florida ("Sheriff McNeil" or "Sheriff"), by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, and N.D. Fla. Loc. R. 56.1, moves this Honorable Court for final summary judgment in his favor. The evidence in this case confirms that there is no genuine dispute as to any material fact, and Sheriff McNeil is entitled to judgment as a matter of law.

Plaintiff's Complaint filed on July 27, 2019, is the operative pleading (Doc. 3), and alleges only one claim against Sheriff McNeil under 42 U.S.C. § 1983 for

"Failure to Treat."[1] Sheriff McNeil filed an answer denying liability and asserting various affirmative defenses. (Doc. 16)

## **INTRODUCTION**

This case involves the incarceration of Bryant Neil Brown in the Leon County Jail ("LCJ") from July 27, 2015 thru December 13, 2016. On July 27, 2015, Plaintiff was booked into the LCJ on charges of dealing in stolen property, defrauding a pawn shop, and grand theft. Prior to being booked into the LCJ, Plaintiff had been diagnosed with Multiple Sclerosis (MS). At the time of his initial booking, Plaintiff alleges that he informed LCJ staff and Corizon staff about his MS condition, and that he was required to take medication for it. Plaintiff claims that between July 27, 2015 and December 13, 2016, Plaintiff made numerous complaints and grievances while in the LCJ about not receiving his MS medication and not being able to see his neurologist. According to Plaintiff, all of his requests were either denied or ignored. Plaintiff claims that as a result of Defendants failing to provide him his medication for MS and proper medical care, he has suffered multiple health crises with lasting effects, which have caused him to experience serious irreversible medical decline.

---

[1] In addition to Sheriff McNeil, Plaintiff has also sued the following under Section 1983 for "Failure to Treat": Corizon, LLC, Maria Liliana Garcia, M.D., individually; Celeste MacDonald, individually; and Debbie Sellers, individually.

Sheriff McNeil contends that while Plaintiff was in the LCJ, he was granted access to medical care, and adequate medical care was provided to him based on the information that was obtained. Also, each of Plaintiff's complaints and grievances concerning medical issues were forwarded to and timely handled by the Corizon medical staff.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

On July 27, 2015, Bryant Neil Brown was arrested and booked into the LCJ on charges of dealing in stolen property, defrauding a pawn shop, and grand theft.[2] (ECF No. 106-2 at 19) The booking process involving Mr. Brown was routine, and included him being photographed, fingerprinted, and interviewed, and asked a series of questions to complete a variety of forms. (ECF No. 106-2 at 17) The Booking Check List form confirms that Mr. Brown was subjected to a pat search, his property was inventoried, he was imaged (photographed), fingerprinted, and placed in a holding cell. (Id.) On the Booking Intake Questionnaire, a form that is routinely completed with every inmate during the booking process, Mr. Brown was asked several questions, including "Do you have any existing injuries?" to which he responded in the negative. (ECF No. 106-2 at 23) Mr. Brown and the LCJ booking officer both signed the completed Booking Intake Questionnaire form. (Id.)

---

[2] At that time, Plaintiff also had pending charges of attempted first degree murder, battery, and child abuse. (ECF No. 106-2 at 11-12)

The booking officer also completed the Inmate Issue/Service Statement form with Mr. Brown, which confirmed that Mr. Brown had been advised of the rules and regulations of the facility, including, among other things, the procedure for requesting health services, what items inmates are allowed to have in housing, and the procedure for using the telephone. (ECF No. 106-2 at 36) Mr. Brown and the LCJ witnessing officer both signed this completed form. (Id.)

The Booking Sergeant, Lillie Christie, completed an Inmate Segregation Medical Notification Sheet that advised medical that Mr. Brown would initially be placed in segregation in Pod G due to his threats against LCJ staff during a previous incarceration. (ECF No. 106-2 at 33) On this return to the LCJ, Mr. Brown went back to segregation until he could be evaluated by classification. (Id.)

The LCJ classification officer/case manager, met with Mr. Brown to determine the appropriate level of custody and housing. (ECF No. 106-2 at 18-20) The classification officer completed the Interviewer's Observation and Score Sheet based on his observations and interview of Mr. Brown. (Id.) The classification officer scored Mr. Brown at a 10 which classified him in a medium custody category. (Id. at 20)

The LCJ operates through numerous policies and procedures that are captured in General Orders, Standard Operating Procedures ("SOP"), and Special Orders. These policies and procedures cover all areas of the operations and administration

of the facility. The policy and procedure pertinent to the provision of medical care and services relevant to this case is SOP 450.M1, entitled "Medical Services." (ECF No. 106-2 at 4-9)

This policy provided the timing of and the manner in which inmates are first medically screened during the booking process, which included a screening within 14 days of booking that assesses and documents each inmate's "[c]urrent illness and health problems . . ., [n]otations of observable deformities or injuries . . ., [s]kin and body condition . . . [i]nquiry into drug and alcohol use, . . ." among other things. (Id. at 5-6) It also provided for how sick call is available to inmates, and required the medical unit and correctional staff to respond to sick call requests and emergencies. (Id. at 7) Pursuant to SOP 450.M1, inmates have the opportunity daily to request health care services by submitting sick call requests through a Health Services Request Form. (Id.) Inmate sick call requests are collected and triaged during the evening medication rounds by the medical staff to determine the immediacy of need. (Id.) Written or verbal sick call requests for non-emergency illnesses/injuries shall be triaged within 24 hours during the week and within 72 hours during weekends by the medical staff. (Id.) Among its directives, the policy required that "[t]he Jail's Medical Operating Procedures shall be standardized, reviewed at least annually by the health authority and covers at a minimum . . . Necessary medical, mental and dental services; . . ." (Id. at 4-5)

The LCJ did not have a policy, custom or practice of violating inmates' constitutional rights to receive medical treatment while incarcerated. (ECF No. 106-1 at ¶ 10; ECF No. 106-3 at ¶ 4) In discovery, when Plaintiff was asked to identify the policy, custom or practice that the Leon County Sheriff had that led to his constitutional rights being violated, he did not identify a policy, custom or practice in his sworn interrogatory answers. (ECF No. 106-5 at 5, ¶ 8) Without identifying a particular policy, custom or practice, Plaintiff essentially restated his Complaint allegations without any evidence in support. (Id.)

At the time of the subject incident and for several years' prior, the Sheriff of Leon County and Corizon Health, Inc. operated under a Health Services Agreement (Agreement). (ECF No. 106-2 at 68-87) The Agreement in existence at the time of this incident first came into effect on October 1, 2014, and carried a three-year term. (Id.) Under the Agreement, Corizon agreed to serve as an independent contractor with "sole responsibility" for "all medical care decisions" at LCJ (Id. at 84, ¶ 11.1), and to:

> provide on a regular basis, all professional medical, dental, mental health (excluding in-patient psychiatric hospitalization), related health care and administrative services for the inmates, a comprehensive health evaluation of each inmate following booking into the Jail in accordance with NCCHC and Florida Model Jail Standards, booking/intake health screenings, including medical evaluation for inmate work details, regularly scheduled sick call, nursing care, regular physician and dentist visits to the Jail, hospitalization, mental health services, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical

> records management, pharmacy services management, health education and training services, a quality assurance program, administrative support services, and other services, all as more specifically described herein.

(Id. at 68-69, ¶ 1.2)

To accomplish this, Corizon was responsible for "provid[ing] medical, mental health, dental, technical, and support personnel as necessary for the rendering of health care services to inmates at the Jail as described in and required by th[e] Agreement." (Id. at 72, ¶ 2.1) The personnel provided by Corizon had to be "licensed, certified or registered, as appropriate, in their respective areas of expertise as required by applicable Florida law." (Id. at 73, ¶ 2.3) The Agreement required Corizon to provide services that would meet or exceed the standards promulgated/developed by the National Commission on Correctional Health Care for Jails (NCCHC), Florida Correctional Accreditation Commission (FCAC) and the Florida Model Jail Standards." (Id. at 74, ¶ 3.1) To this end, Corizon agreed to "cooperate fully with the Sheriff in all efforts to maintain formal accreditation of the Jail's health care program." (Id.) The Parties agreed to regular reporting (Id. at 75-76, ¶ 5.3), access to certain records (Id. at 76-77, ¶¶ 5.6 and 5.7), and a mechanism if the Sheriff was dissatisfied with certain personnel. (Id. at 73, ¶ 2.4) Finally, the Parties addressed any lawsuits (Id. at 82, ¶ 10.2) and included a duty by Corizon to indemnify the Sheriff. (Id. at 82-83, ¶ 10.3)

In compliance with policy, it was notated on the Booking Check List form that Mr. Brown needed to have a medical evaluation by the medical unit. (ECF No. 106-2 at 17) After the LCJ staff completed their portion of the booking process on Mr. Brown, they transferred him to Corizon medical staff for a medical screening. (Id.)

Paramedic Kimberly Roddenberry, a Corizon employee, conducted a medical screening on Mr. Brown and documented her findings in a completed Intake and Receiving Screening form. (ECF No. 106-2 at 44-46) During the medical screening process, Paramedic Roddenberry's interview and critical observations of Mr. Brown revealed no need for an urgent/emergent medical referral. (Id. at 44) Paramedic Roddenberry noted that Mr. Brown did have mobility restrictions or limitations, and noted that he has MS. (Id.) She also noted that Mr. Brown had abdominal surgery on July 22, 2015 for his appendix. (Id.)

In the "Substance Abuse" section, Paramedic Roddenberry noted that Mr. Brown advised her that he drank alcohol and he used drugs such as "methamphetamines, cocaine, molly and pot." (Id. at 45) In the "Medical Problems (continued)" section, Paramedic Roddenberry indicated that he had MS (Multiple Sclerosis). (Id. at 46) In the "Examination" section, Paramedic Roddenberry noted that Mr. Brown's overall general appearance indicated that he was "NAD" (in no apparent distress). (Id.)

In addition, Paramedic Roddenberry obtained Mr. Brown's signed consent for medical services (Id. at 46, 48), reviewed access to care with him (Id. at 46, 47), and explained the grievance process to him. (Id. at 46) Paramedic Roddenberry next notified Ms. Stephens, LPN, her immediate supervisor and charge nurse, and referred Mr. Brown to her in the medical department to have a medical evaluation for the completion of a history and physical. (Id.)

As the charge nurse, Ms. Stephens evaluated and assessed Mr. Brown and completed a history and physical form. (Id. at 40-43) Ultimately, Ms. Stephens determined Mr. Brown was in no apparent distress at that time. For the remainder of his stay in the LCJ, Mr. Brown was provided medical care by the Corizon medical staff as needed.

<u>Plaintiff's Medical Grievances and Requests</u>

The LCJ maintains an Inmate Handbook that sets forth the various rules and regulations applicable to those incarcerated at the LCJ. The Inmate Handbook is provided to each inmate being booked into the LCJ. (ECF No. 106-2 at 61-67) Plaintiff acknowledged receipt of said rules and regulations as he was booked into the LCJ. (Id. at 36)

The Handbook provided the following Procedures pertaining to medical issues:

## MEDICAL

<u>Medical issues, requests, complaints and grievances must be submitted using a Corizon Medical Sick Call Request or Grievance Form so your issue/request/complaint/grievance can be addressed by Medical Authority</u>.

Medical, dental and mental health services are provided as needed. To request these services, you must submit a "<u>Sick Call Request</u>" using Corizon forms located in your Pod. You received written sick call procedures at the time of medical screening shortly after being booked in to this facility. Your Pod Officer will assist you if you no longer have the instructions.

* * *

## MEDICAL GRIEVANCE PROCEDURES

Inmates incarcerated at the Leon County Jail will be afforded the opportunity to grieve medical care provided by Corizon. A medical grievance can be described as a problem that an inmate has, related to the medical department, and have been unable to resolve through proper channels.

A "<u>sick call request</u>" should be answered within the next **72 hours.** A "<u>grievance</u>" should be answered within **10 days** of receipt. Please make sure you submit the correct form for your medical issue to avoid unnecessary delays.

Any inmate can grieve medical treatment by filling out a Corizon Medical Grievance Form, located in their assigned housing area. Inmates will submit the Grievance Form to the Corizon, Health Services Administrator.

A written response will be returned to the grieving inmate within ten (10) days after date of receipt of the complaint.

If the grievance is not resolved to the inmate's satisfaction, the inmate can request an appeal of the response to the original grievance.

* * *

(Id. at 61-67)

Based on the LCJ records, the following table depicts the grievances and requests submitted by Plaintiff during his incarceration:

| Date | Summary of Complaint | Date & Response |
|------|---------------------|-----------------|
| 8/27/15<br><br>ECF No. 106-4 at 3 | <u>Grievance</u>:  "I am writing again to inquire about my medication for my multiple sclerosis (MS) which you all said you were going to get for me from my doctor! It is now been 32 days? Dr. Ayala, Tallahassee neurological clinic, medication: Gilenya." | 9/8/15<br>"Chart to MD -review records regarding Gilenya, .5 mg. Review records from Dr. Ayala with Dr. Garcia. Last visit documented was 2013. Prescription is not current."<br>Deborah Sellers, RN, HSA |
| 5/22/16<br><br>Id. at 4 | <u>Grievance</u>:  "I asked to be put on medication for my multiple sclerosis. 1 am still having symptoms. This doesn't seem to be important to you all! 1 do not want to end up with permanent damage due to not being treated." | 6/2/16<br>"Plan of care was explained/documented on 5/26/16. Please address further through sick call."<br>Deborah Sellers, RN, HSA. |

| 6/07/16 Id at 5 | Grievance: "On 06-June, 2016, I was seen by PA Celeste McDonald who stated I will not receive any medication for an irreversible nerve disease known as relapsing, remitting, multiple sclerosis. Only do to having not seen a neurologist since late 2013. This is irrelevant. This disease isn't going anywhere. I haven't had the access to see a neurologist the past year and a half. l1lis constitutes his medical deliberate indifference because Corizon is a for-profit organization which is attempting to save money by denying me proper and adequate medical care comparable to the "free world." I have had multiple symptoms since September 2015 while here in their care. They continued to deny me the proper care and medication. At this point, I have contacted my attorney and consider to file a civil action for negligence." | 6/9/16 "I am aware of the situation. Discussed case with site medical director. Your last (neurological) appointment 2013. You will continue to be monitored." Deborah Sellers, RN, HSA. |
| 9/11/16 ECF No. 106-2 at 37 | Health Services Request Form: "I have multiple sclerosis (MS). I've been having symptoms since my annual checkup, numbness, balance, and vision difficulties, bad headaches, depressed. Three grievances have been filed with you of my MS." | 9/11/16 The nurse referred him to the physician and he was prescribed Solumedrol 125 mg |
| 10/16/16 Id. at 38 | Health Services Request Form: "Dr. Garcia: I was told I missed my MRI appointment due to court? Please re-schedule ASAP. I have court again on 10-24-16. Still experiencing numbness, blurred vision, tremors of extremities, tremors with (unintelligible). ASAP! Needs MRI to get proper medication. Needs attention for court case." | 10/17/16 It was addressed and you are rescheduled. Referred to NSC (nurse sick call). |

| 11/22/16 Id. at 39 | Health Services Request Form: "I am requesting a bottom bunk pass due to having difficulty climbing up to the top bunk. I am recently experiencing numbness in left side arm/leg and (unintelligible) pain in spine all from symptoms of my multiple sclerosis. I have an appointment to see a neurologist per Dr. Garcia. Request lower bunk pass." | 11/23/16 The nurse granted him a temporary low bunk pass. |
|---|---|---|
| 12/04/16 ECF No. 106-4 at 6 | Grievance: "I am writing once again in regards to this issue of getting put on medication for my multiple sclerosis. It has now been a month since my MRI was performed which shows that my disease has progressed while I have been here. I feel that you will all in the medical department are not taking this seriously. I have still experiencing symptoms which include numbness, blurred vision, and extremities that shake. I have been referred to see a neurologist but I do not understand why it is taking so long to see him. You all have known of my disease since 2015 and are just now taking action. I will be filing a suit against this jail and medical department if I have permanent damage due to lack of treatment." | "Your records were reviewed by specialist and then you were given an appointment. We cannot disclose/discuss your appointment date. Is in process."  Debbie Sellers, RN, HSA |

As stated above, all of Plaintiff's grievances and requests were properly reviewed, addressed and responded to by the Corizon medical staff. Mr. Brown did not appeal any of the grievance responses, as outlined in the Inmate Handbook. (ECF No. 106-2 at 65)

Plaintiff testified in his deposition that while he was in the LCJ, he was denied Gilenya, the medication he requested for his MS, and provided a different medication, Copaxone, as a cost-saving measure for the Sheriff's Office and Corizon. (ECF No. 106-6 at 77-78) However, Plaintiff has produced no evidence to support this allegation. Further, when asked directly, Plaintiff admitted that no one at the LCJ told him that the reason he did not get Gilenya was because it was too expensive. (Id. at 78) Plaintiff also testified that the he was told at the LCJ that he did not have a current prescription for his MS medication.  (Id.) In addition, Dr. Ayala testified that he prescribed Copaxone for Plaintiff and the cost of Copaxone was about the same as Gilenya. (ECF No. 106-7 at 9-10; 91) Dr. Ayala further testified that Mr. Brown use of illicit drugs for years was not good for him and his drug use was going to make his MS worse. (Id. at 66-67)

In his Complaint, Mr. Brown references a January 20, 2016 Order from a Leon County Circuit Judge that ordered the LCJ to provide Mr. Brown with medication for Multiple Sclerosis. (ECF No. 3 at 3) However, Plaintiff has not produced any evidence to establish that anyone at the LCJ received this Order or was made aware of it. (ECF No. 106-4 at 7) The face of the Order does not reflect that anyone at the LCJ was provided a copy. (Id.) Plaintiff's criminal defense attorney, Sean Desmond, who filed the motion to obtain the order testified that he did not provide a copy of the order to anyone at the LCJ. (ECF No. 106-8 at 13-16) In addition, Joanna

14

Johnson, who worked with Mr. Desmond on Mr. Brown's behalf on his substance abuse issues, testified that she did not provide the subject order to the LCJ, nor did she have any conversations about this order with any LCJ employees. (ECF No. 106-9 at 17, 21, 24-25) Further, Plaintiff's subsequent counsel, after Mr. Desmond withdrew, Public Defender Colleen Mullen, testified that she only became aware of the Order in December 2016, and she did not provide the Order to anyone at the LCJ. (ECF No. 106-10 at 14-17)

Dr. Garcia secured an appointment for Mr. Brown with his neurologist, Dr. Ricardo Ayala, on December 13, 2016. (ECF No. 106-7 at 46, 96) At this appointment, Dr. Ayala noted that Mr. Brown's treatment for his MS was discontinued in 2012 due to him not attending follow-up appointments. (ECF No. 106-7 at 68-70, 96). Dr. Ayala further noted that Mr. Brown was discontinued from the clinical trial for Gilenya due to cocaine use. (Id.). In his records, Dr. Ayala also noted that Mr. Brown continued using illicit drugs up until July 2015. (ECF No. 106-7 at 96). Dr. Ayala ultimately wrote a prescription for Copaxone for Mr. Brown's MS symptoms. (ECF No. 106-7 at 100) Dr. Ayala also recommended that Mr. Brown have a cervical MRI. (Id.) Further, Dr. Ayala advised the patient to follow up as needed. (Id.)

The Corizon medical staff followed Dr. Ayala's recommendations and continued to provide medical treatment and services to Mr. Brown. A follow-up visit

for Mr. Brown was scheduled with Dr. Ayala for May 15, 2017. (ECF No. 106-2 at 101) Mr. Brown's main complaint at this appointment was left-side facial numbness. (Id.) Dr. Ayala noted that Mr. Brown had been consistently taking his three injections a week of Copaxone with no indications of negative side effects. (Id.) Dr. Ayala also noted that Mr. Brown's issue with left facial numbness might be related to TMJ, for which he recommended jaw exercises. (Id.) Dr. Ayala advised the patient to follow up as needed.  (Id. at 104) The Corizon medical staff continued to provide medical treatment and services to Mr. Brown until he was released to the Department of Corrections in 2018. (ECF No. 106-2 at 14)

## MEMORANDUM OF LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(a), Federal Rules of Civil Procedure; Celotex v. Catrett, 477 U.S. 317 (1986). Which factual disputes are genuine and which facts are material is determined by substantive law. Anderson v. Liberty Lobby, Inc., 47 U.S. 242 (1986). "Mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F. 3d 1321, 1326 (11th Cir. 2005). In the present case, Defendant Sheriff McNeil asserts that summary judgment is appropriate for him on Count I as a matter of law as detailed below.

## **Legal Argument**

### **Plaintiff's Federal § 1983 Claim (Count I) Fails as a Matter of Law**

Plaintiff asserts that Sheriff McNeil in his official capacity was deliberately indifferent to his serious medical needs. Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's Cruel and Unusual Punishment Clause, and deliberate indifference to a pretrial detainee's serious medical needs violates the Fourteenth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1115 (11th Cir. 2005). Nevertheless, a pretrial detainee's claims of inadequate medical care are evaluated under the same standard as a prisoner's claim under the Eighth Amendment's Cruel and Unusual Punishment Clause. See Nam Dang by & through Vina Dang v. Sheriff, Seminole County Florida, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017).

Plaintiff's suit against Sheriff McNeil in his official capacity seeks to impose liability against a governmental entity. Cook ex rel. Estate of Tessier, 402 F.3d at 1115. Section 1983 liability against Sheriff McNeil in his official capacity can be established by Plaintiff showing: (1) there was an underlying violation of her constitutional right; (2) Sheriff McNeil enacted a policy or custom that amounted to deliberate indifference to that constitutional right; and (3) the policy or custom

caused the violation of her constitutional right. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).

### 1. Underlying Constitutional Violation

To satisfy the first element, there must be an underlying violation of Plaintiff's constitutional right. On this issue, Plaintiff has failed to allege specifically the violation of any constitutional right by any LCJ employee.

### 2. Policy or Custom that amounts to Deliberate Indifference

As the Supreme Court explained in <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, (1978), "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." Accordingly, to satisfy the second element, there must be a custom or policy that amounts to deliberate indifference. <u>McDowell</u>, 392 F.3d at 1289.

"A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997). "A policy is a decision that is officially adopted … or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]." <u>Id.</u> Deliberate indifference means that the policy or custom was implemented despite "known or obvious consequences." <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 407 (1997).

In contrast to the deliberate indifference standard used to establish an underlying constitutional violation by an individual, there is no subjective knowledge component to determine whether a governmental entity's policy or custom amounts to deliberate indifference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 841 (1970). The standard as applied to a governmental entity is objective, <u>Id.</u>, and can be satisfied by showing that a ***pattern*** of constitutional violations ***of the type at issue*** were taking place such that the governmental entity was ***on notice*** of the problem and its failure to institute corrective change amounted to deliberate indifference. <u>Brown</u>, 520 U.S. at 407 (emphasis added). It can also be satisfied based on a single constitutional violation if the violation is a "highly predictable" consequence of the governmental entity's policy or custom. <u>Id</u>. at 409. Whether based on a pattern or a single violation, "[a] showing of simple or even heightened negligence will not suffice." <u>Id</u>. at 407.

### 3. Causation

The third and final element of a deliberate indifference claim against a governmental entity is causation. <u>McDowell</u>, 392 F.3d at 1289. Causation is established when the governmental entity's policy or custom is the ***"moving force"*** behind the constitutional violation. <u>Id</u>. at 1292 (emphasis added). Stated differently, the constitutional violation must be a ***"plainly obvious consequence"*** of the policy or custom. <u>Brown</u>, 520 U.S. at 407 (emphasis added).

Analysis

Plaintiff cannot produce evidence to show a disputed issue of a material fact on any one of these three elements. However, before an analysis can take place of whether any action or inaction by the Defendants constituted deliberate indifference, Plaintiff must first show that he was suffering from a "serious medical need," which is defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations omitted). See also Farmer v. Brennan, 511 U.S. 825, 934 (1994) (holding that a serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm.").

The Eleventh Circuit has "recognized a variety of medical needs as serious medical needs," including finding that "broken bones and bleeding cuts are serious medical needs that require attention within hours." Melton v. Abston, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam). "Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances." Id.; see also Brown v. Hughes, 894 F.2d 1533, 1538 n.4 (11th Cir. 1990) (per curiam) (collecting cases and noting that a "recent traumatic injury," such as a beating, automobile accident, soft-tissue shoulder injury, or a one-and-a-half-inch bleeding cut, is generally sufficient to demonstrate a serious medical need).

20

Although Plaintiff identified in his Complaint that he suffers from MS and identified that as "a serious medical condition," he did not identify a "serious medical need" at the time of being booked into the LCJ. However, assuming Plaintiff can show a "serious medical need" under the facts of this case, Plaintiff cannot show that the Sheriff in his official capacity acted with deliberate indifference to that need. Farrow, 320 F.3d at 1243.

There is no evidence that any LCJ employee violated Plaintiff's constitutional rights by refusing to provide Plaintiff with access to medical care. Indeed, Plaintiff was advised of how to request and access medical care on his initial intake into the LCJ during the booking process. In addition, Plaintiff was provided a copy of the LCJ Inmate Handbook which outlined the process for assessing medical care while in the LCJ. Sick Call forms were also provided for the inmates within each of the Pods. Thus, Plaintiff was provided with ample avenues to access medical care while in the LCJ.

Also devoid from the record in this case is any evidence of an actual policy that amounted to deliberate indifference. In his Complaint, Plaintiff asserts that he is entitled to relief against the Sheriff for unidentified "policies" which lead to a violation of his Fourteenth Amendment rights. When asked in discovery through contention interrogatories to identify the specific policies that led to his constitutional rights allegedly being violated, Plaintiff provided a full-page

response that failed to identify a specific policy. Plaintiff did state under oath that he "contends that the actions of the Sheriff may justify *an inference both of deliberate indifference and negligence.*"[3] In the end, Plaintiff has failed to produce any evidence of an actual policy that amounted to deliberate indifference.

Further, Plaintiff has failed to produce any evidence to establish a pattern of constitutional violations of the type at issue that were taking place such that that the Sheriff was *on notice* of the problem and failed to take any corrective action. Indeed, Plaintiff has not identified a single prior incident to form the foundation needed for such a claim. Without any evidence that the Sheriff maintained a longstanding and widespread practice to encourage this type of conduct, Plaintiff's Monell claim premised on an unofficial custom of failure to provide inmates with access to medical care is insufficient. Goodman, 718 F.3d at 1335. In addition, Plaintiff has failed to present a constitutional violation that was a "highly predictable" consequence of the Sheriff's policy or custom.

Moreover, there was no delay that equated to deliberate indifference in this case. A prison official's act of delaying the medical care for a serious medical need may constitute an act of deliberate indifference. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999); Harris v. Coweta County, 21 F.3d 388, 393–394 (11th Cir.

---

[3] It should be noted Plaintiff has not raised a claim of negligence in this action.

1994); Brown v. Hughes, 894 F.2d 1533, 1537–39 (11th Cir. 1990). See also Farrow, 320 F.3d at 1246–47 (holding that a prison dentist's 15–month delay in procuring dentures for a prisoner *without reasonable explanation* created a jury question as to whether deliberate indifference occurred) (emphasis added). "Delayed medical treatment can rise to the level of deliberate indifference when: (1) 'it is apparent that delay would detrimentally exacerbate the medical problem'; (2) the delay actually seriously exacerbates the problem; and (3) 'the delay is medically unjustified.'" Visage v. Woodall, Case No. 19-11017, 2020 WL 30348, *3 (11th Cir. Jan. 2, 2020) (quoting Taylor v. Adams, 221 F.3d 1254, 1259-60 (11th Cir. 2000). "An inmate who complains that delay in medical treatment [rises] to a constitutional violation *must place verifying medical evidence in the record* to establish the detrimental effect of the delay." Hill v. Dekalb Reg'l. Youth Detention Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (emphasis added), abrogated on other grounds, Hope v. Pelzar, 536 U.S. 730 (2002); see also Cannon v. Corizon Medical Servs., Case No.: 19-10774, 2019 WL 6044817, *5 (11th Cir. Nov. 15, 2019).

Here, Plaintiff cannot show the factors established by the Eleventh Circuit. After being seen and evaluated by the medical staff within his first two weeks at the LCJ and then being seen on a regular basis by the LCJ medical staff thereafter, the record does not reflect any delay that equates to deliberate indifference to a serious medical need. Nor has Plaintiff produced any medical evidence to establish that Dr.

Garcia's course of treatment or any delay incurred in scheduling Plaintiff's neurologist, Dr. Ayala, had any detrimental effect.

Additionally, Plaintiff attempts to assert an unreasonable delay in this case when he references a court order entered on January 20, 2016, ordering the LCJ to provide him his MS medication, that was not complied with for approximately a year. However, Plaintiff has failed to present any evidence in this case that the LCJ staff was provided a copy of this order or was even made aware of this order.  Thus, it cannot serve as proof of an unreasonable delay by the Sheriff in this case. Because Plaintiff cannot show under Eleventh Circuit precedent that any delay was so unreasonable that it equated to deliberate indifference, summary judgment for Defendant is warranted.

Furthermore, Sheriff McNeil and the LCJ staff were entitled to rely on the evaluations and assessments of Plaintiff by Corizon staff. Institutional staff who are not medical providers are not liable when they rely on the medical expertise of medical staff. See Keith v. DeKalb Cnty., Ga., 749 F.3d 1034, 1050 (11th Cir. 2014) ("A sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others."); see also Berry v. Peterman, 604 F.3d 435 (7th Cir. 2010) (the law with respect to prisoners' Eighth Amendment deliberate indifference claims encourages non-medical security and administrative personnel at jails and

prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so). "Simply put, the law does not require that [the Sheriff] ignore the determination and recommendation of [medical staff] staff." Keith, 749 F.3d at 1050; see also Acosta v. Watts, 281 Fed. Appx. 906, 908 (11th Cir. 2008) (Supervisory officials cannot be held liable for a constitutional tort when their decisions were grounded in a decision made by medical personnel); Drake ex rel. Cotton v. Koss, 445 F. 3d 1038, 1042-43 (8th Cir. 2006) ("… it is not deliberate indifference when an official relies on the recommendations of a trained professional. … [T]he law does not require a jailer to second-guess or disregard a psychiatrist's opinions or treatment recommendations.") (internal quotation and citation omitted).

The Sheriff's reliance on Corizon's staff should foreclose any deliberate indifference claim. "Under our circuit's precedent, when a lay person is accused of deliberate indifference, the plaintiff must 'present[ ] evidence that her situation was so obviously dire that . . . [officers] must have known that a medical professional had grossly misjudged [the plaintiff's] condition.'" Kuhne v. Florida Dept. of Corrections, 818 Fed. Appx. 498, 507 (11th Cir. 2015) (quoting Townsend v. Jefferson Cnty., 601 F.3d 1152, 1159 (11th Cir. 2010). "[W]hen the plaintiff has received treatment from medical professionals, correctional officers are entitled to rely on the medical judgments made by those medical

professionals." <u>Carter v. Butts</u>, Case No.:5:18-cv-423, 2020 WL 1882908, \*6 (M.D. Ga. March 18, 2020). <u>See also</u> <u>Bauer v. Kramer</u>, 424 Fed. Appx. 917, 919 (11th Cir. 2011) ("[A] nurse is not deliberately indifferent  when she reasonably follows  a doctor's orders by administering prescribed medication to an inmate.").

In the present case, Plaintiff cannot show that he displayed any behavior or made any statement which was observed or heard by the LCJ staff to displace this well-established precedent. Specifically, once Corizon's medical staff, based on their professional training and personal observations, assessed and treated Plaintiff,  there is  no  evidence  t h a t  Plaintiff  did  or  said  anything that would make it "**so obviously dire** that . . . [officers] must have known that [they] had **grossly misjudged** [Plaintiff's] condition. <u>Kuhne</u>, *supra*.

Finally, Plaintiff has no evidence in the record to support that any alleged policy or custom was the ***"moving force"*** behind Plaintiff's alleged violation. In other words, that any such policy or custom ***caused*** injury to Plaintiff. Indeed, the record contains evidence that other factors such as Plaintiff's non-compliance with medical treatment and his use of illicit drugs prior to being booked into the LCJ could have caused Plaintiff's injuries. As a result, Plaintiff's § 1983 claim in Count I against Sheriff McNeil fails, and summary judgment is warranted on this count.

## CONCLUSION

For the foregoing reasons, Defendant Sheriff McNeil respectfully requests this Honorable Court to grant this motion and enter final summary judgment in his favor on the claim in Count I.

Respectfully submitted,

*/s/ Dawn P. Whitehurst*
**DAWN POMPEY WHITEHURST**
Florida Bar No. 0794546
Email: dwhitehurst@sniffenlaw.com
**MICHAEL P. SPELLMAN**
Florida Bar No. 0937975
Email: mspellman@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida  32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004
***Attorneys for Defendant***
***Sheriff Walt McNeil***

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

In accordance with N.D. Fla. Loc. R. 56.1(E) and 7.1(F), undersigned counsel hereby certifies that the instant motion and memorandum of law contain 6,371 words.

*/s/ Dawn P. Whitehurst*
**DAWN POMPEY WHITEHURST**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this <u>27th</u> day of April, 2021, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Northern District of Florida, Tallahassee Division, using the CM/ECF system, which will serve a copy to all counsel of record.

*/s/ Dawn P. Whitehurst*
**DAWN POMPEY WHITEHURST**